[No. B121612. Second Dist., Div. One. July 28, 1999.]

KENNETH P. HAHN, as Assessor, etc., et al., Plaintiffs and Appellants,
v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent;
INTERNATIONAL BUSINESS MACHINES CORPORATION, Real Party
in Interest and Respondent.

**COUNSEL**

Lloyd W. Pellman, County Counsel, and Albert Ramseyer, Principal Deputy County Counsel, for Plaintiff and Appellant Kenneth P. Hahn, Assessor, County of Los Angeles.

Louise H. Renne, City Attorney, and Claude F. Kolm, Deputy City Attorney, for Plaintiff and Appellant Doris Ward, Assessor, City and County of San Francisco.

Ann Ravel, County Counsel, and James Rees, Deputy County Counsel, for Plaintiff and Appellant Lawrence E. Stone, Assessor, County of Santa Clara.

Richard E. Winnie, County Counsel, and Richard Karlsson, Assistant County Counsel, for Plaintiff and Appellant John Scott, Assessor, County of Alameda.

Robert Westmeyer, County Counsel, and Joseph Folkard, Deputy County Counsel, for Plaintiff and Appellant John Tuteur, Assessor, County of Napa.

Laurence M. Watson, County Counsel, and James Persinger, Deputy County Counsel, for Plaintiff and Appellant Bradley Jacobs, Assessor, County of Orange.

John Sansone, County Counsel, and Andrew Freeman, Deputy County Counsel, for Plaintiff and Appellant Gregory J. Smith, Assessor, County of San Diego.

Albin C. Koch for the Cities of Delano, Dinuba, Huron, Monterey, Orange Cove, Pittsburg, Redlands, San Luis Obispo and Union City and the California County Counsel's Association as Amici Curiae on behalf of Plaintiffs and Appellants.

Teresa L. Highsmith, Acting City Attorney, for the City of Alameda as Amicus Curiae on behalf of Plaintiffs and Appellants.

Manuela Albuquerque, City Attorney, for the City of Berkeley as Amicus Curiae on behalf of Plaintiffs and Appellants.

Ronald R. Ball, City Attorney, for the City of Carlsbad as Amicus Curiae on behalf of Plaintiffs and Appellants.

John M. Kaheny, City Attorney, for the City of Chula Vista as Amicus Curiae on behalf of Plaintiffs and Appellants.

Scott H. Howard, City Attorney, for the City of Glendale as Amicus Curiae on behalf of Plaintiffs and Appellants.

Linda A. Callon, City Attorney, for the City of Gilroy as Amicus Curiae on behalf of Plaintiffs and Appellants.

Francis R. Ruggieri, City Attorney, for the City of Gustine as Amicus Curiae on behalf of Plaintiffs and Appellants.

Robert E. Shannon, City Attorney, for the City of Long Beach as Amicus Curiae on behalf of Plaintiffs and Appellants.

Robert K. Booth, City Attorney, for the City of Los Altos as Amicus Curiae on behalf of Plaintiffs and Appellants.

Don G. Kircher, City Attorney, for the City of Port Hueneme as Amicus Curiae on behalf of Plaintiffs and Appellants.

Daniel J. Wallace, City Attorney, for the City of Santa Barbara as Amicus Curiae on behalf of Plaintiffs and Appellants.

Michael R. Downey, City Attorney, for the City of Santa Clara as Amicus Curiae on behalf of Plaintiffs and Appellants.

Steven T. Mattas, City Attorney, for the City of South San Francisco as Amicus Curiae on behalf of Plaintiffs and Appellants.

Mark G. Sellers, City Attorney, for the City of Thousand Oaks as Amicus Curiae on behalf of Plaintiffs and Appellants.

Charles O. Lamoree, City Attorney, for the City of Vacaville as Amicus Curiae on behalf of Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, David S. Chaney, Richard W. Bakke and Raymond B. Jue, Deputy Attorneys General, for Defendant and Respondent.

O'Melveny & Myers, Holly E. Kendig, Frederick A. Richman and Glenn A. Trager for Real Party in Interest and Respondent.

## OPINION

**VOGEL (Miriam A.) J.**—In 1946, J. Presper Eckert and John William Mauchley developed the first high-speed electronic digital computer, the ENIAC. It filled a 30-by-50 foot room and weighed 30 tons. It had 18,000 vacuum tubes, 70,000 resistors, and 5 million soldered joints. Information was fed to it by turning a series of dials until they corresponded to the correct digits. The executable instructions making up a program were embodied in separate units that were plugged together to form a route for the flow of information, and had to be redone after each computation. The following year, Eckert and Mauchley built the EDVAC, the first computer with electronically-stored programs. Following the invention of the transistor in 1947, transistors replaced vacuum tubes, and by 1956, there was a

second generation of smaller, faster, more reliable, and more energy-efficient computers. Integrated circuits were invented in 1958. By the 1960's, programming languages had been developed, and the creation of the "stored program concept" meant that instructions to run a computer for a specific function (known as a program) were stored in the computer's memory, where they could be quickly replaced by a different set of instructions for a different function. With the development of integrated circuits, semiconductors, and the microprocessor (by Intel in 1971), computers got smaller and smaller.[1]

It was at about this stage in the development of the computer that the State of California formally considered the assessment of computers for property tax purposes. At first, computer hardware was viewed as taxable personal property, computer software was not. In the early 1970's—before the first mass-marketing of personal computers in 1975—the Orange County Assessor, in valuing computers for property tax purposes, included the value of the computers' programs. In 1972, the Legislature addressed that issue and concluded that a computer's "[s]torage media for computer programs" was to be valued as if "there were no computer program on such media except basic operational programs" and taxed accordingly; "[o]therwise, computer programs" were not taxable. (Rev. & Tax. Code, § 995.)[2]

In 1975, Microsoft was founded, followed by Apple in 1976. By 1978, there were more than 500,000 computers used in the United States. By 1980, that number exceed 1,000,000. In 1981, IBM introduced its personal computer. In 1982, by which time there were more than 5.5 million personal computers in use, Time Magazine named the computer as the "man of the year." By 1989, there were more than 50 million computers in use in the United States. In 1990, the World Wide Web was born. Within two months of its release in August 1995, Microsoft had sold 7 million copies of Windows 95. (See fn. 1, *ante*.)

In 1996, the Board of Equalization had to interpret the 1972 statute (§ 995) to apply to today's computers. The Board looked at the Legislature's intent, heard testimony from experts and from all interested parties, and ultimately amended its rules. Dissatisfied with the amendment, a number of

---

[1]See *History of Computing Devices*, http://www.llcc.cc.il.us/dbeverid/histintr.htm; *Jones Telecommunications & Multimedia Encyclopedia, Computers: History and Development*, http://www.digitalcentury.com/encyclo/update/comp_hd.html; Meyers, *A Short History of the Computer*, http://www.softlord.com/comp; Polsson, *Chronology of Events in the History of Microcomputer*, http://www.islandnet.com/~kpolsson/comphist.htm; *A Brief History of the Computer*, http://www.villanova.pvt.k12.ca.us/Project1/tbents/index.html; *The Development of the Computer*, http://www.cs.princeton.edu/~kguinee/Thesis/Computer.html.

[2]Undesignated section references are to the Revenue and Taxation Code.

Assessors filed suit, claiming the Board had exceeded its authority by creating a new property tax exemption. The trial court rejected the Assessors' arguments and entered judgment against them. We affirm.

## FACTS

*The Statute.* Unless it is exempt, tangible personal property used in connection with a trade, profession or business or for the production of income is taxable by the State of California (§§ 103, 201; Cal. Code Regs., tit. 18, §§ 123, 134), with "special types" of personal property defined when the Legislature concludes that such definitions are necessary. (See, for example, §§ 985 [toll bridges], 986 [works of art owned by the artist], 988 [motion pictures], 990 [migratory livestock ranged in two or more counties].) In 1972, the Legislature enacted section 995 to provide, as relevant, that "[s]torage media for computer programs shall be valued . . . as if there were no computer program on such media except basic operational programs. *Otherwise, computer programs shall not be valued for purpose of property taxation.*" (Stats. 1972, ch. 165, § 1, p. 385, italics added.)[3] In 1973, some of the terms used in section 995 were defined by a new statute, section 995.2. (Stats. 1973, ch. 990, § 2, p. 1907.) For example, "basic operational program," as used in section 995 to describe that which *is* taxable (as opposed to that which is *not* taxable), is defined as "a computer program which is fundamental and necessary to the functioning of a computer. A basic operational program is that part of an operating system including supervisors, monitors, executives and control or master programs which consist of the control program elements of that system." (§ 995.2.) Sections 995 and 995.2 have not been amended since 1973.

*Rule 152.* In 1972, the Board of Equalization adopted section 152 of title 18 of the California Code of Regulations (Rule 152) to define and demonstrate by way of examples the distinctions between taxable "basic operational programs" and other, nontaxable computer programs within the meaning of section 995.[4] Rule 152 was amended in 1974, then remained unchanged until 1996 (the details of the 1972 and 1974 versions are discussed below). For present purposes, it suffices to note that, until 1995,

---

[3]The remaining paragraphs of section 995 provided (and continue to provide) as follows: "As used in this section, storage media for computer programs may take the form of, but are not limited to, punched cards, tapes, discs or drums on which computer programs may be embodied or stored. [¶] As used in this section, a computer program may be, but is not limited to a set of written instructions, magnetic imprints, required documentation or other process designed to enable the user to communicate with or operate a computer or other machinery."

[4]The Board of Equalization was created in 1879, and originally charged with the responsibility for ensuring that county property tax assessment practices were equal and uniform throughout the state. That charge has been expanded over the years and, among other things, the Board now administers California's property tax programs. (http://www.boe.ca.gov/about.htm.) To that end, subdivisions (c) and (e) of section 15606 of the Government Code

everyone seems to have construed the statute and the rule to mean that the only taxable program was that which came installed on the hardware, and that separately-purchased, later-installed software was not taxable.

*The 1996 Amendment to Rule 152.* In 1995, the Orange County Assessor's Office sent a notice of assessment to International Business Machines Corporation (IBM) in which it assessed property taxes for "unbundled" computer programs—software programs that were not included in the price of the hardware. IBM protested. In response, the Board of Equalization conducted a series of public hearings, received written and oral comment from interested persons, considered expert testimony about the technical meaning of certain computer terms, reviewed the legislative history of sections 995 and 995.2, and heard arguments on both sides of the issue.[5] In 1996, the Board amended Rule 152 to clarify the issue, and subdivision (d) of the Rule now provides (as relevant) that "[t]he term 'basic operational program' refers to a 'control program,' as defined in section 995.2 . . . , that is included in the sale or lease price of the computer equipment. A program is included in the sale or lease price of computer equipment if (i) the equipment and the program are sold or leased at a single price, or (ii) the purchase or lease documents set forth separate prices for the equipment and the program, but the program may not be accepted or rejected at the option of the customer."

*This Lawsuit.* In December 1996, the Assessors of eight California counties filed a declaratory relief action against the Board of Equalization, with IBM named as the real party in interest. The Assessors asked for a declaration that Rule 152, as amended in 1996, is invalid because (in their view) it grants a property tax exemption that is contrary to the language and intent of sections 995 and 995.2 (as well as article XIII of the California Constitution). In March 1998, on cross-motions for summary judgment, the trial court ruled in favor of the Board, finding that the 1996 amendment was a legitimate exercise of the Board's rule-making authority and was consistent with the Legislature's 1972 intent to exempt computer programs. Seven of

---

direct the Board to "[p]rescribe rules and regulations to govern . . . assessors when assessing" and to "[p]repare and issue instructions to assessors designed to promote uniformity throughout the state and its local taxing jurisdictions in the assessment of property for the purposes of taxation . . . ." Section 15607 of the Government Code directs the Board to "summon assessors to meet with it or its duly authorized representatives at least once annually . . . to study or discuss problems of administration of assessment and taxation laws and to promote uniformity of procedure in tax matters throughout the state."

[5]The hearings are authorized by Government Code section 11346 et seq., the statutes that establish the basic minimum procedural requirements for the adoption, amendment or repeal of administrative regulations.

the eight Assessors filed timely notices of appeal from the judgment there-after entered.[6]

### DISCUSSION

■■ The Assessors contend the 1996 amendment to Rule 152 illegally "exempts property that the Legislature meant to tax." The Assessors concede that section 995 "forbids the taxation of computer programs other than 'basic operational programs,' " but contend the statutory definition of "basic operational programs" in section 995.2 *unambiguously* permits the taxation of basic operational programs *without exception*." (Italics in original.) In more prosaic terms, the Assessors contend that while the Legislature defined "basic operational programs" according to program function, the 1996 amendment to Rule 152 has broadened the section 995 exemption by taking into consideration both the function and the manner of acquisition of "basic operational programs" and by limiting the definition to "bundled" programs. We disagree.

### A.

Originally, the business community viewed computer programs as intangible personal property that was exempt from property tax. Originally, this view was shared by the Assessors. ■■ ■ ■ Accordingly, when the Orange County and Los Angeles County Assessors announced (in the early 1970's) their intent to depart from this view and to assess computer programs as tangible personal property, the Legislature quickly responded.[7] In February 1972, Assembly Bill No. 438 (A.B. 438) was introduced as an

---

[6]The appellants are the Assessors or Assessor-Recorders of the Counties of Los Angeles, Alameda, Napa, Orange, Santa Clara and San Diego, and the City and County of San Francisco.

[7]This background information is taken primarily from the legislative history contained in the administrative record that was before the trial court (and that is now before us on this appeal). Generally speaking, the scope of review (the trial court's and ours) in a case such as this is narrow, and we will uphold the Board's exercise of its quasi-legislative rule-making power if we are "satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute . . . ." (*Yamaha Corp. of America* v. *State Bd. of Equalization* (1998) 19 Cal.4th 1, 10-11 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 565 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Friends of the Old Trees* v. *Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1391 [61 Cal.Rptr.2d 297].) We nevertheless review the rule independently for consistency with controlling law (*Yamaha Corp. of America* v. *State Bd. of Equalization, supra,* 19 Cal.4th at p. 11, fn. 4), and to that end may judicially notice the legislative history of sections 995 and 995.2. We therefore grant the Assessors' request that we take judicial notice of the legislative history. (Evid. Code, §§ 452, 459; *State Bd. of Equalization* v. *Board of Supervisors* (1980) 105 Cal.App.3d 813, 819-820 [164 Cal.Rptr. 739].)

urgency measure to add section 995. (Assem. Bill No. 438 (1972 Reg. Sess.).) After several amendments in the Assembly and the Senate, A.B. 438 expressly distinguished between a "computer program" ("a set of written instructions, magnetic imprints, required documentation or other process designed to enable the user to communicate with or operate a computer") and "storage media for computer programs" (which might take the form of "punched cards, tapes, discs or drums on which computer programs may be embodied or stored"), and provided that "[s]torage media for computer programs shall be valued . . . as if there were no computer program on such media." (Sen. Amend. to Assem. Bill No. 438 (1972 Reg. Sess.) May 2, 1972, § 1.) The Legislature spelled out its intent: *"The value of computer programs is not now subject to property tax, was not intended to be subject to property tax and shall not be subject to property tax, either directly or indirectly or through the inclusion of the value of such computer programs in evaluating related storage media for computer programs.* Taxation of these expressions of creativity would be detrimental to research and an expansion of business activity within the state." (*Id.* at § 2, italics added.)

On the same day A.B. 438 was sent to the Governor (May 10, 1972), the County Supervisors Association of California urged the Governor to veto the bill, claiming it had "two particularly distasteful features." First, it would prevent local governments from taxing computer software. Second, it would prevent "local government[s] from taxing 'bundled' software (software that comes with [the] computer when you buy it) . . . . This will produce a revenue loss since we have been taxing this type of software." From the County Supervisors' perspective, the "bill [was] nothing more than a cost shift from the business community to the residential property taxpayer." (Assembly Final History, A.B. No. 438 (1972 Reg. Sess.); Letter from County Supervisors Association to the Governor, May 10, 1972.)

The bill was returned to the Legislature, and amended to provide that "[s]torage media for computer programs shall be valued . . . as if there were no computer program on such media *except basic operational programs.* Otherwise, computer programs shall not be valued for purpose of property taxation." (Assem. Bill No. 438, Amended in Conf. (1972 Reg. Sess.) June 7, 8, 1972, § 1.) This amendment made it clear that the Assessors could include in the value of the computer hardware the basic computer programs that were "bundled" in the price of the computer, thereby preserving the existing tax base. At the same time, the Legislature made it equally clear that the reference to "basic operational programs" was intended solely to pre-serve the existing tax base, and that the computer programs were *not* taxable property: *"It is the intent of the Legislature that only those basic operational programs which are presently being assessed and taxed in the various coun-ties continue to be assessed and taxed. The value of other computer programs*

*is not now subject to property tax and shall not be subject to property tax,* either directly or indirectly or through the inclusion of the value of such computer programs in evaluating related storage media for computer programs." (*Id.* at § 2, italics in original.)[8]

The County Supervisors Association wrote again to the Governor, acknowledging that the amendments had resolved the revenue loss problem and, on June 23, the Governor signed A.B. 438, enacted as section 995. (Stats. 1972, ch. 165, § 2, p. 385.)

### B.

In September 1972, the Board adopted the original version of Rule 152, to provide that "basic operational programs" included those that were "bundled" *and* those that were "acquired separately," and included "processing" and "service programs that assist in common repetitive operations of the computer." When the business community objected, the Assembly Revenue and Taxation Committee held hearings. In December, the Board admitted that it was "the general practice of county assessors, both here and elsewhere in the Nation, to tax only software sold by a hardware vendor at a 'bundled price'" (that is, without separating the price of the software from the price of the hardware). As a result, the Assembly Revenue and Taxation Committee concluded that, by treating both bundled and unbundled programs as "basic operational programs," the Board's adoption of Rule 152 was inconsistent with the statement of legislative intent in A.B. 438 (that "basic operational programs" referred only to the programs presently being assessed and taxed in the various counties).

### C.

The Legislature acted swiftly. In 1973, Assembly Bill No. 69 (A.B. 69) was introduced to add a new section 995.2 (and to make other changes that are not relevant to this discussion). (Sen. Amend. to Assem. Bill No. 69 (1973-1974 Reg. Sess.) Jan. 15, 1973.) To make it clear that the original version of Rule 152 was inconsistent with the intent of A.B. 438, the

---

[8]When the Board was considering the 1996 amendment to Rule 152, the Chief Consultant to the Assembly Revenue and Taxation Committee in 1972 (David R. Doerr) explained that the "intent of the Legislature was to limit the property tax on computer software to control programs *necessary for the operation of the computer and included in the sales price of computer equipment.*" (Italics added.) As he explained, when A.B. 438 was originally submitted to the Governor, it proposed an exemption for *all* computer software. When the Association of County Supervisors objected, the Legislature responded with the amendment that permitted the Assessors to continue to assess and tax "bundled" software *because bundled software was then being assessed.* Other software would not be taxed.

Legislature used section 995.2 to define "basic operational program" to mean "a computer program which is fundamental and necessary to the functioning of a computer. A basic operational program is that part of an operating system including supervisors, monitors, executives and control or master programs which consist of the control program elements of that system. [¶] For purposes of this section the terms 'control program' and 'basic operational program' are interchangeable." (Stats. 1973, ch. 990, § 2, p. 1907.) A.B. 69 expressly provided that it did "not constitute a change in, but [was] declaratory of, existing law" (Stats. 1973, ch. 990, § 3, p. 1907), and therefore left unmodified the statement of intent in A.B. 438—that the Legislature intended "basic operational programs" to refer only to programs being assessed in the various counties as of 1972. A.B. 69 was approved by the Governor in October 1973. (Assembly Final History, Assem. Bill No. 69 (1973-1974 Reg. Sess.).)

### D.

In February 1974, the Board repealed the original version of Rule 152 and adopted a new Rule 152 that referred to "basic operational programs" only in connection with computer equipment sold for a bundled or "single" price. The Assessors thereafter gave up their efforts to assess unbundled computer programs, and taxes collected in 1973 under the earlier version of Rule 152 were refunded. For more than two decades thereafter, there was no issue about the manner in which computers were taxed—taxpayers reported and were taxed upon the full price of the computer equipment without reduction for the basic computer programs included in the price of the equipment. Unbundled computer programs were not assessed as taxable property.[9]

During that same 20-year period, the number of computers in use in the United States grew from about 500,000 to more than 50 million. (See fn. 1 *ante*.)

### E.

As noted at the outset, the Orange County Assessor's Office decided in 1995 to increase revenue by taxing unbundled computer programs. When IBM objected, the Board held comprehensive public hearings and invited the participation of all interested parties. Testimony was received from the Assessors and the affected industries, and from others. It was at these hearings that the Board also heard from the Chief Consultant to the Assembly Committee on Revenue and Taxation (who had drafted the language of the bills enacting sections 995 and 995.2), who testified "unequivocally that the purpose [of the exception for basic operational programs] was

---

[9]The record shows (without contradiction) that none of the 58 California counties had assessed unbundled software for at least 23 years.

to obviate the need for trying to segregate the price of the operational software built into a computer from the total value of the computer," and the intent was to make it clear "that computer software was exempt from taxation in California, except to the extent that basic operational programs were incorporated on computer hardware storage media and valued as part of the computer hardware." (See fn. 8, *ante.*) In 1996, the Board amended Rule 152 to provide, as relevant:

"(a) *Computer programs shall not be valued for purposes of property taxation, except with respect to the valuation of storage media as provided in section 995* . . . . [¶] (b) Storage media for computer programs, as defined in section 995 . . . shall be valued as if there were no computer program on such media except basic operational programs. [¶] . . . . [¶] (d) *The term 'basic operational program' refers to a 'control program,' as defined in section 995.2* . . . *that is included in the sale or lease price of the computer equipment.* A program is included in the sale or lease price of computer equipment if (i) the equipment and the program are sold or leased at a single price, or (ii) the purchase or lease documents set forth separate prices for the equipment and the program, but the program may not be accepted or rejected at the option of the customer. [¶] (e) In valuing computer equipment that is sold or leased at a single price not segregated between taxable property and nontaxable programs as defined in section 995.2 . . . , the assessor, lacking evidence to the contrary, may regard the total amount charged as indicative of the value of taxable tangible property." (Italics added.)[10]

### F.

The Assessors contend the 1996 amendment to Rule 152 is invalid. They point to article XIII, section 1 of the California Constitution and insist that it means what it says—that, "[u]nless otherwise provided by this Constitution or the laws of the United States . . . [¶] . . . [a]ll property is taxable . . . ." It follows, according to the Assessors, that only the Legislature, with two-thirds of the membership of each house concurring, may classify personal property for exemption (Cal. Const., art. XIII, §§ 1, 2), and that the Board of Equalization's adoption of the 1996 amendment to Rule 152 is an attempt to

---

[10]The current dispute arose when the Orange County Assessor attempted to assess IBM as the *licensor* of computer programs that it was licensing to its customers in Orange County, notwithstanding that IBM was not the owner or possessor of the *storage media* on which such computer programs were embodied or stored. When the Board adopted the 1996 amendments to Rule 152, it also clarified that the proper person to assess is the one who owns, controls or possesses the *storage media* on which the taxable program is embodied (the user or customer), not the owner or licensor of the *program* (such as a software licensor). (§§ 405, 995; Rule 152(a), (b), (c).) The Assessors do not challenge this portion of the 1996 amendment to Rule 152. (See also Cal. Code Regs., tit. 18, § 133.)

usurp the Legislature's prerogative. If the Board had created an exemption where none existed or adopted a rule inconsistent with the Legislature's intent, the Assessors would be right. But that is not what happened in this case.

The 1996 amendment to Rule 152 does not create an exemption. It is entirely consistent with and does no more than clarify sections 995 and 995.2. (Gov. Code, § 11342.2; *Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at pp. 10-11; *Ontario Community Foundations, Inc. v. State Bd. of Equalization* (1984) 35 Cal.3d 811, 816-817 [201 Cal.Rptr. 165, 678 P.2d 378].) It carries out the Legislature's stated intent. (*Milligan v. City of Laguna Beach* (1983) 34 Cal.3d 829, 831 [196 Cal.Rptr. 38, 670 P.2d 1121] [when the Legislature has stated the purpose of its enactment in unmistakable terms, we must apply the enactment in accordance with the legislative direction].) It follows that, in adopting the 1996 amendment to Rule 152, the Board was acting within the scope of the duty properly delegated to it by the Legislature—to enforce the property tax law of this state and to prescribe the rules and regulations to govern Assessors. (Gov. Code, § 15606.) This delegation is proper, notwithstanding that it confers some degree of discretion on the administrative body, and an exercise of that discretion executed within the scope of the controlling statute will not be disturbed by a trial court or by us. (*Henry's Restaurants of Pomona, Inc. v. State Bd. of Equalization* (1973) 30 Cal.App.3d 1009, 1020 [106 Cal.Rptr. 867].) Indeed, the 1996 amendment to Rule 152 enjoys a presumption of correctness, and the burden is on the Assessors to demonstrate its invalidity. (*Mission Pak Co. v. State Bd. of Equalization* (1972) 23 Cal.App.3d 120, 125 [100 Cal.Rptr. 69].) As the Legislative history detailed above demonstrates, the Assessors cannot satisfy this burden.

To avoid this ineluctable conclusion, the Assessors contend that, for "twenty-two years, the Board understood that the *function* of the program [that is, a "basic operational program" as opposed to a "processing program" as defined in section 995.2] determined its taxable status," and that the 1996 amendment to Rule 152 "creates a subclass of basic operational programs that are nontaxable: those that are not included in the sale or lease price of the computer equipment." This, they say, illegally exempts property from taxation. They are wrong. The legislative history shows that "function" was never the sole relevant factor to determine whether computer software was taxable. From the beginning, the major focus has been on two considerations: (1) to tax only that which was taxed in 1972; and (2) to tax only "bundled" programs, not separately acquired software. As the draftsman of the legislation explained, the exception for "basic operational programs" was included to "obviate the need for trying to segregate the price of the

operational software *built into a computer* from the total value of the computer." (See also fn. 8, *ante.*) Of course, the Assessors' focus on function conveniently ignores the fact that the Legislature's 1974 enactment of section 995.2 was the catalyst for the Board's subsequent repeal of the original version of Rule 152 in which the Board had attempted to permit the Assessors to include "unbundled" programs in the value of storage media. In short, the Legislature said the Board could not do that which the Assessors now claim it must do.

In any event, the Legislature stated in 1972, and reaffirmed in 1973, that *"only those basic operational programs which [were in 1972] being assessed and taxed in the various counties [would] continue to be assessed and taxed. The value of other computer programs is not now subject to property tax and shall not be subject to property tax . . . ."* (Assem. Bill No. 438, Amended in Conf. (1972 Reg. Sess.), *supra,* § 2, some italics added; see also Assem. Bill No. 69, Stats. 1973, ch. 990, § 3, p. 1907.) It is undisputed that, in 1972, the "basic operational programs" made taxable were those "bundled" with the computer hardware, not software sold separately. Since "function" is at best tangentially relevant to what was or wasn't taxed in 1972, it follows that the Assessors' analysis must fail. (*Yamaha Corp. of America* v. *State Bd. of Equalization, supra,* 19 Cal.4th at pp. 12-13 [long-standing statutory interpretation is entitled to deference].)[11]

G.

A number of cities have filed an amicus curiae brief on behalf of the Assessors.[12] They point out the obvious—that today's computer technology and manufacturing capabilities are such that "many sophisticated software programs for both business and personal use are available in the marketplace and can be purchased either separately or installed in a computer." They suggest that this progress was unanticipated by the Legislature when sections 995 and 995.2 were enacted in the early 1970's, and they complain that the Board's interpretation of the statute encourages an approach that would avoid imposition of a tax that, in their view, ought to be imposed. As the

---

[11]It is undisputed that everyone treated separately-purchased software as exempt for more than 20 years. The record shows that, in 1986, after the Board added a separate column to its property tax returns for reporting computer *equipment,* some taxpayers mistakenly included computer *programs* in that column. The Board then added an instruction to taxpayers, telling them: "Do not include software costs."

[12]The original amicus curiae cities are Delano, Monterey, Redlands, Union City, Alameda, Berkeley, Chula Vista, Glendale, Gustine, Long Beach, Los Altos, Santa Barbara, South San Francisco and Vacaville. Later, they were joined (with our permission) by the Cities of Carlsbad, Dinuba, Gilroy, Huron, Orange Cove, Pittsburg, Port Hueneme, San Luis Obispo, Santa Clara, Thousand Oaks and the California County Counsel's Association.

trial court noted, the decision whether to amend the statute to respond to the dramatic changes in the computer industry is one for the Legislature, not for the courts. However outmoded the statute may be, and whatever the motivation for the Assessors' efforts to expand rather than diminish the definition of taxable personal property, the bottom line is that the Board has interpreted the Legislature's intent in terms of today's technology and, in our view, that interpretation is correct.[13] Beyond that, it is out of our hands.

### DISPOSITION

The judgment is affirmed. The Board of Equalization and IBM are entitled to their costs of appeal.

Spencer, P. J., and Masterson, J., concurred.

Petitions for a rehearing were denied August 16, 1999, and appellants' petition for review by the Supreme Court was denied October 27, 1999.

---

[13]According to *California Property Tax: An Overview* (Publication 29, May 1999), which can be found at the Board's web site (http://www.boe.ca.gov), it is California's counties, cities, schools and special districts that depend on property taxes as their primary source of revenue. The state's principal revenue sources are personal income taxes, sales and use taxes, bank and corporation taxes, and a series of excise taxes.