[No. G039342. Fourth Dist., Div. Three. Sept. 30, 2008.]

CARDINAL HEALTH 301, INC., Plaintiff and Appellant, v.
COUNTY OF ORANGE, Defendant and Respondent.

■■■■■■■■■■■■■■■■■■■■■■■■

COUNSEL

Pillsbury Winthrop Shaw Pittman, Jeffrey M. Vesely and Richard E. Nielson for Plaintiff and Appellant.

Benjamin P. de Mayo, County Counsel, and Laurie A. Shade, Deputy County Counsel, for Defendant and Respondent.

Robert A. Ryan, Jr., County Counsel (Sacramento) and Thomas R. Parker, Deputy County Counsel, for Sacramento County Assessor Kenneth Stieger as Amicus Curiae on behalf of Defendant and Respondent.

OPINION

SILLS, P. J.—

## I. INTRODUCTION

The instant case presents a textbook example of how easy it is to confuse the difference between "necessary" and "sufficient" conditions. In California, all computer software subject to property tax is "bundled" (i.e., comes preinstalled on the computer when you buy it). But not all "bundled" computer software is subject to property taxation. Certain kinds of software are not subject to property taxation even if they do come "bundled" with the computer hardware.

More specifically, the Legislature has clearly stated, in sections 995 and 995.2 of the Revenue and Taxation Code,[1] that "application" software, as distinct from "basic operational" software, is *not* to be valued for purposes of property taxation. And the State Board of Equalization has clearly provided, in section 152 of title 18 of the California Code of Regulations—often referred to as "Rule 152"[2]—that taxpayers may demonstrate that a portion of the value of a computer represents nontaxable application software despite the fact that *application* software came "bundled" inside the computer when the customer bought or leased it.

That is, bundling is a necessary condition for taxation, but not a sufficient condition. In this case, however, the Orange County Assessor (Assessor) appears to have confused what is necessary with what is sufficient. The

---

[1] All statutory references in this opinion are to that code.

[2] All references to "the rule" or "Rule 152" in this opinion are to section 152 of title 18 of the California Code of Regulations.

Assessor says the fact of bundling is dispositive. The trial court's judgment agreeing with the Assessor must, accordingly, be reversed.

## II. BACKGROUND

It takes little imagination to recognize that hospitals would be prime consumers for some sort of automated medicine dispensing and computerized tracking system. Dangerous drugs need to be tracked, timing and dosage of medicines given to patients needs to be monitored, and prices better accounted for. As a Purdue University of Pharmacy professor has written, "The invention and production of these devices brought hopes of reduced rates of medication errors, increased efficiency for pharmacy and nursing staff, ready availability of medications where they are most used (the nursing unit or inpatient ward), and improved pharmacy inventory and billing functions."[3]

Several such systems are currently on the market, including the Pyxis MedStation 2000, leased to hospitals by Cardinal Health 301, Inc., a Delaware corporation with its principal place of business in California. The system can be described as a series of standup medicine storage cabinets, each called a "MedStation," with a built-in computer. As the assessment appeals board would later note, "Patient and medication information is programmed into the MedStation, so that the equipment will dispense the appropriate medications, at the proper intervals, to be administered to patients at the facility." Ninety percent of the value of each unit consists of proprietary computer software systems.[4]

The Orange County Assessor's Office performed an audit of the company's personal property, and issued "escape assessments" for the tax years 2000 through 2003 based on the leased value of its MedStation 2000 units. The phrase "escape assessment" is simply tax jargon for putting property on the rolls not enrolled earlier. (See § 531;[5] *Pacific Mutual Life Ins. Co. v. County of*

---

[3] See Murray, Making Health Care Safer: A Critical Analysis of Patient Safety Practices (July 2001) Automated Medicine Dispensing Devices, chapter 11 <http://www.ahrq.gov/clinic/ptsafety/chap11.htm> (as of Sept. 30, 2008). One might also find the site by "googling" "Murray" and "Automated Medication Dispensing Devices."

[4] While the 90 percent figure represents the contention of Cardinal Health, for purposes of this appeal the 90 percent figure has been accepted by the Assessor. (See respondent's brief.)

[5] Which provides: "If any property belonging on the local roll has escaped assessment, the assessor shall assess the property on discovery at its value on the lien date for the year for which it escaped assessment. It shall be subject to the tax rate in effect in the year of its escape except as provided in Section 2905 of this code. [¶] Property shall be deemed to have escaped assessment when its owner fails to file a property statement pursuant to the provisions of Section 441, to the extent that this failure results in no assessment or an assessment at a valuation lower than would have obtained had the property been properly reported. Escape assessments made as the result of an owner's failure to file a property statement as herein

*Orange* (1985) 187 Cal.App.3d 1141, 1149, fn. 5 [232 Cal.Rptr. 233] [noting expert testimony that "the definition of an escape assessment 'is an assessment added to the roll to account for property which had apparently failed to have been enrolled earlier or originally' "].)

Cardinal Health then timely filed appeals from each of the various escape assessments. Three days later, it paid the taxes based on the bills issued after the audit.

The appeals then came before the assessment appeals board. In a written opinion, the board first found that Cardinal Health's software "is not sold or leased separately from the MedStation equipment, and is not priced separately for sale or lease, and does not have any use outside of the MedStation itself. The software is therefore 'embedded' or 'bundled' in the various MedStation units." The board then noted that the Assessor had "used the cost of the MedStation units as a basis for valuing each unit, with no deduction or offset for the software embedded in the equipment."

It was strictly on the basis of the "bundling" or "embedding" of the software that the board upheld the Assessor's approach. First, the board cited Rule 152, subdivision (e), which it noted "provides that when the Assessor values computer equipment that is sold or leased at a single price not segregated between taxable property and nontaxable programs, the Assessor may regard the total amount charged (in such sale or lease) as indicative of the value of the taxable property." (The board didn't mention Rule 152, subd. (f), which comes next and has something to say about the situation outlined in subd. (e).) Then the board delivered the coup de grace, based on the dispositiveness of bundling: "This Board finds that the methodology used by the Assessor to value the subject equipment is correct, because the software is embedded in the equipment, and is not sold or leased separately from the equipment, and therefore the value of the software cannot be segregated from the value of the MedStation units."

There is, however, one fact to which the assessment appeals board only alluded, but should be expressly noted now: As mentioned above, it is undisputed in this appeal that Cardinal Health presented information to the Assessor and the appeals board that would have *allowed* the Assessor to segregate the value of the firm's nontaxable proprietary application software from the otherwise taxable MedStation units. The appeals board made its decision assuming that such information was irrelevant.

---

provided shall be subject to the penalty and interest imposed by Sections 463 and 506, respectively. This paragraph shall not constitute a limitation on any other provision of this article." (§ 531.)

Able counsel on each side of this case have, in order to present as pristine an issue of law to the courts as possible, agreed that valuation qua valuation is not at dispute. Thus, while the board noted in its written decision that Cardinal Health "contends that computer software systems constitute approximately ninety percent (90%) of each MedStation unit," this court need not address the validity of Cardinal Health's valuation.[6] Rather, our task is simply to ascertain whether the board was correct in reasoning that *the very fact* of embedding proprietary software ("bundling") inside each MedStation is dispositive. But that is getting ahead of ourselves for a few paragraphs.

To return to the narrative of events leading to this appeal, after the assessment appeals board rendered its decision, Cardinal Health filed a complaint for refund of property taxes in the superior court. The case was tried to the court on stipulated facts, which was basically the administrative record before the assessment appeals board. Like the board, the trial court considered the fact of bundling (or "embedding") dispositive.[7]

This appeal timely followed. As noted, there are no issues of valuation. We are not concerned, for example, whether the evidence would support segregation of 90 percent of the value of each MedStation, or 25 percent of the value. Nor are we concerned with the quality of information which Cardinal Health had previously supplied the Assessor to allow the Assessor to, as Rule 152, subdivision (f) says, "to make an informed judgment concerning the proper value to be ascribed to taxable and nontaxable components" except for the fact that this taxpayer has indeed supplied such information to the Assessor. Rather, our focus is very narrow: We need only determine whether the board and trial court were correct in considering the prepackaging of the software inside each MedStation, with no opportunity given the customer to purchase the software separately, is dispositive.

---

[6] Though the Assessor pretty much assumes that on the opening page of his respondent's brief, when he says that the embedded software "constitutes 90%" of each MedStation's value.

[7] Here is the relevant text from the trial court's minute order explaining its decision: "Whether the subject property is exempt from taxation depends on the interpretation of California Revenue and Taxation Code sections 995, 995.2, and Property Tax Rule 152 of the California Code of Regulations, title 18 § 152. The Court has reviewed Hahn v State Board of Equalization in detail and finds a strong similarity to the instant case. The Court finds that the exemptions from taxation sought by applicants were unfounded. The computer hardware and software were sold as a unit and bundled into the operating system. As such, the Court finds, as in Hahn, that the legislature's long-held position on computer taxation calls for taxation on the control system and exemption on later sold/purchased applied programs. The computer hardware and software operating programs herein were only sold/leased as a unit. Even though the systems could handle separate functions, the customer could only purchase or lease them as a 'package deal.' "

### III. DISCUSSION

#### A. The Statutes

##### 1. *Section 995*

■ Section 995 provides that computers shall be valued for property tax purposes "as if there were no computer program on such media except basic operational programs." If a program is not a "basic operational program" it is not to be valued.

The next three paragraphs after this one set out the complete text of section 995. Readers should note that the concept of bundling or embedding is not to be found in it. The statute merely sets out this simple rule: Only "basic operational" software shall be valued for purposes of property taxation. Thus, if the only authority one had was section 995, one would have to conclude that *non*-"basic operational" software that was bundled inside a computer when it was delivered to the customer was not taxable:

"Storage media for computer programs shall be valued on the 1972 lien date and thereafter as if there were no computer program on such media *except basic operational programs.* Otherwise, computer programs shall not be valued for purpose of property taxation.

"As used in this section, storage media for computer programs may take the form of, but are not limited to, punched cards, tapes, discs or drums on which computer programs may be embodied or stored.

"As used in this section, a computer program may be, but is not limited to a set of written instructions, magnetic imprints, required documentation or other process designed to enable the user to communicate with or operate a computer or other machinery." (§ 995, italics added.)

##### 2. *Section 995.2*

■ The next four paragraphs after this one set out the entirety of section 995.2. The statute treats "processing" and "application" programs synonymously. It also treats "basic operational" and "control" programs synonymously. Section 995.2 makes clear that "application" (or "processing") programs do not come within the definition of a "basic operational" program, i.e., are not to be valued for taxation under section 995. Again, readers will look in vain for any thought that "application" (or "processing") software—that is, software that is *not* "basic operational" software—is somehow

magically transformed into "basic operational" software merely by being embedded into the computer:

"The term 'basic operational program,' as used in Section 995, means a computer program that is fundamental and necessary to the functioning of a computer. A basic operational program is that part of an operating system including supervisors, monitors, executives, and control or master programs that consist of the control program elements of that system.

"For purposes of this section, the terms 'control program' and 'basic operational program' are interchangeable. A control program, as opposed to a processing program, controls the operation of a computer by managing the allocation of all system resources, including the central processing unit, main storage, input/output devices and processing programs. A processing program is used to develop and implement the specific applications that the computer is to perform. Its operation is possible only through the facilities provided by the control program. It is not in itself fundamental and necessary to the functioning of a computer.

"Excluded from the term 'basic operational program' are processing programs, which consist of language translators, including, but not limited to, assemblers and compilers; service programs, including, but not limited to, data set utilities, sort/merge utilities, and emulators; data management systems, also known as generalized file-processing software; and application programs, including, but not limited to, payroll, inventory control, and production control. Also excluded from the term 'basic operational program' are programs or parts of programs developed for or by a user if they were developed solely for the solution of an individual operational problem of the user.

"A control program, as used in this section, includes the following functions: selection, assignment, and control of input and output devices; loading of programs, including selection of programs from a system resident library; handling the steps necessary to accomplish job-to-job transition; controlling the allocation of memory; controlling concurrent operation of multiple programs or computers; and protecting data from being inadvertently destroyed as a result of operator program error."

### 3. *Rule 152*

Since neither section 995 nor 995.2 mentions bundling (or embedding) at all, such authority as might be found for the Assessor's position can only be found in Rule 152, and specifically in Rule 152, subdivision (d). We will now examine Rule 152 subdivision by subdivision. (We also quote the entirety of

Rule 152 in the margin so that readers who prefer to read the various subdivisions of the regulation as they appear in the regulation as a whole can do so, though we will also parse its constituents seriatim.)[8]

As an overview, though, Rule 152's function is to address the practical problem of the *valuation of application* software—clearly not taxable under

[8] Here is the complete text of Rule 152:

"(a) Computer programs shall not be valued for purposes of property taxation, except with respect to the valuation of storage media as provided in section 995 of the Revenue and Taxation Code. A licensor of a computer program who does not own, claim, possess or control the storage media on which the program is embodied or stored shall not be subject to assessment with respect to the value of the licensor's copyright interest in the computer program, or with respect to the value of the license fees charged for the use of the computer programs.

"(b) Storage media for computer programs, as defined in section 995 of the Revenue and Taxation Code, shall be valued as if there were no computer program on such media except basic operational programs.

"(c) In accordance with Revenue and Taxation Code Section 405, storage media for computer programs shall be assessed to the person owning, claiming, possessing or controlling the storage media on the lien date. Storage media shall not be assessed to the owner of the copyright in the computer program embodied or stored on the media if the owner of the copyright does not also own, claim, possess or control the storage media subject to assessment.

"(d) The term 'basic operational program' refers to a 'control program,' as defined in section 995.2 of the Revenue and Taxation Code, that is included in the sale or lease price of the computer equipment. A program is included in the sale or lease price of computer equipment if (i) the equipment and the program are sold or leased at a single price, or (ii) the purchase or lease documents set forth separate prices for the equipment and the program, but the program may not be accepted or rejected at the option of the customer.

"(e) In valuing computer equipment that is sold or leased at a single price not segregated between taxable property and nontaxable programs as defined in section 995.2 of the Revenue and Taxation Code, the assessor, lacking evidence to the contrary, may regard the total amount charged as indicative of the value of taxable tangible property.

"(f) A person claiming that a single-price sale or lease includes charges for nontaxable programs and services should be required to identify the nontaxable property and services and supply sale prices, costs or other information that will enable the assessor to make an informed judgment concerning the proper value to be ascribed to taxable and nontaxable components of the contract.

"(g) When the nontaxable components of a package composed of computer hardware, basic operational programs and nontaxable programs and services may be accepted or rejected at the option of the customer and the charge for each is itemized, such itemization constitutes evidence of the value of the component. Prices charged, whether at the wholesale or the retail level, for hardware only or hardware and basic operational programs also constitute evidence of the value of such property that may be used in segregating values when taxable and nontaxable properties or services are covered by a single-price contract.

"(h) Example 1 (Personal Computers).

"Included in the price of every IBM and IBM compatible personal computer and every Apple and every Apple compatible personal computer is a basic input output system (BIOS). BIOS is a copyright computer program that controls basic hardware operations, such as interactions with diskette drives, hard disk drives and the keyboard, that the [*sic*] facilitates the transfer of data and control instructions between the computer and peripherals. The operation of other computer programs, such as the various versions of Disk Operating Systems (DOS),

section 995.2—when it comes embedded within a computer. The problem is solved by placing the *burden on the taxpayer* to come forth with sufficient "information" to enable the assessor to segregate the value of the nontaxable software from the otherwise taxable "basic operational" software plus hardware. Rule 152, subdivision (f) clearly contemplates the possibility that a taxpayer can "identify the nontaxable property and services and supply sale prices, costs or other information that will enable the assessor to make an informed judgment concerning the proper value to be ascribed to taxable and nontaxable components of the contract." In other words, the sale or lease price is not *necessarily* what is taxable if the taxpayer carries that burden of identification.

Now, let us parse Rule 152 subdivision by subdivision, looking just at the language:

### a. Subdivision (a)

Subdivision (a) of Rule 152 is a restatement of section 995, with the added (but obvious) thought that someone who does not actually "own, claim, possess or control" over the "storage media" of the computer (say, the "hard drive" or programmable memory) shouldn't be taxed for it: "(a) Computer programs shall not be valued for purposes of property taxation, except with respect to the valuation of storage media as provided in section 995 of the Revenue and Taxation Code. A licensor of a computer program who does not own, claim, possess or control the storage media on which the program is embodied or stored shall not be subject to assessment with respect to the value of the licensor's copyright interest in the computer program, or with respect to the value of the license fees charged for the use of the computer programs."

---

Windows, OS/2, UNIX and similar programs, is possible only through the facilities provided by BIOS, but operational programs other than BIOS are not in themselves fundamental and necessary to the functioning of the computer.

"(2) Example 2 (Mainframe Computers).

"Included in the price of the IBM mainframe computers is a license to use IBM's Licensed Internal Code (LIC) on the computer. LIC is a set of copyrighted computer programs (commonly referred to in the computer industry as microcode) that include the programs that implement the basic functions of the mainframe computer and operate the control logic necessary to execute user instructions to the computer. Manufacturers of other computers likewise include in the price of their computers the microcode necessary to implement the basic functions of the computer. The operation of other computer programs is possible only through the facilities provided by microcode, but operational programs other than microcode are not in themselves fundamental and necessary to the functioning of the computer."

### b. Subdivision (b)

Subdivision (b) of Rule 152 is nothing more than a restatement of section 995, just in fewer words: "(b) Storage media for computer programs, as defined in section 995 of the Revenue and Taxation Code, shall be valued as if there were no computer program on such media except basic operational programs."

### c. Subdivision (c)

The focus of subdivision (c) of Rule 152 is on *who* is responsible for paying the property tax on the value of the *storage media*—today we usually call that the "hard drive" or "programmable memory"—which contains the software in the computer. The subdivision consists of two sentences, both of which have the phrase "shall be assessed" as their verbs, and the person owning the storage media, as their objects: "(c) In accordance with Revenue and Taxation Code Section 405, storage media for computer programs shall be assessed to the person owning, claiming, possessing or controlling the storage media on the lien date. Storage media shall not be assessed to the owner of the copyright in the computer program embodied or stored on the media if the owner of the copyright does not also own, claim, possess or control the storage media subject to assessment." (*Ibid.*)

### d. Subdivision (d)

And now we come to subdivision (d) of Rule 152 (subdivision (d)), which bears almost all of the freight of the Assessor's argument in this case. It consists of two sentences.

The first sentence sets up two equations. The first equation is: "basic operational program" equals " 'control program,' *as defined in* section 995.2 of the Revenue and Taxation Code . . . ." (Rule 152, italics added.) To quote again from the second paragraph of section 995.2: "For purposes of this section, the terms 'control program' and 'basic operational program' are interchangeable."

That is, A = B. But one should note here that "B" is something that has been *defined already* in section 995.2. In fact, the A = B equation was originally made there. One should also note here that by limiting the definition of "control program" to one "defined in section 995.2," the state board was obviously trying *not to contradict* what the Legislature has said in section 995.2. Whatever "B" is (a "control" program as defined), it has been "defined in section 995.2."

The second equation is contained in the subordinate clause that ends the sentence: "The term 'basic operational program' refers to a 'control program,' as defined in section 995.2 of the Revenue and Taxation Code, *that is included in the sale or lease price of the computer equipment.*" (Subd. (d), italics added.)

Thus, not only does A = B, but A equals a certain kind of B, one "that is included in the sale or lease price of the computer equipment." Thus whatever it is that can be described as either a "basic operational" or "control" program, it must be "included in the sale or lease price of the computer equipment."

■ The upshot: After reading subdivision (d), the reader has a very precise definition of "basic operational," that is, taxable, software. It must both (1) meet the definition of a control program as defined by section 995.2, and (2) be included in the sale or lease price of the computer equipment.

Ironically, as we shall see when we discuss *Hahn v. State Bd. of Equalization* (1999) 73 Cal.App.4th 985 [87 Cal.Rptr.2d 282] (*Hahn*) in detail below, this narrow definition drew the ire of county tax assessors back in the late 1990's, because it meant that basic operational software—clearly taxable under section 995—which was *not* bundled into the price of a computer would not be taxable.

■ The next, and last sentence of subdivision (d) is an elaboration on the *limitation* set forth in the ending appositive clause of the first sentence to the effect that a control program is defined by being "included in the sale or lease price of the computer equipment": "A program is included in the sale or lease price of computer equipment if (i) the equipment and the program are sold or leased at a single price, or (ii) the purchase or lease documents set forth separate prices for the equipment and the program, but the program may not be accepted or rejected at the option of the customer."

Again, readers will note that the sentence is nothing more than a definition, i.e., an equation. The sentence undertakes to tell the reader what the phrase "included in the sale or lease price of the computer equipment" means. To return to our analogy, A = B as long as B is a certain kind of B, and the second sentence of subdivision (d) tells the reader what is meant by "a certain kind of B."

And what is meant by that certain kind of B? Answer: Either selling or leasing "at a single price," or selling at separate prices if the customer has no choice, qualifies. In short, after reading subdivision (d), the reader really knows what bundling is.

And that is the end of subdivision (d). Not once does it say that application software as defined in section 995.2 is taxable. Nor does it say that *if* otherwise nontaxable application software under section 995.2 ends up being bundled into the price of a computer, · *then* it is transformed into taxable "basic operational software" under section 995. What it does say is that "basic operational software" *must* be bundled in order to be "basic operational software" under section 995, and if not, it's not taxable. (That thought, by the way, is reiterated again in Rule 152, subd. (h), as we will see when we get there.)

One might wonder at this point: Is the board being a bit too lenient with taxpayers in effectively requiring software to be *both* "basic operational" *and* bundled in order to be taxable under section 995? As we alluded to above, a group of assessors thought so, and asserted that position in the *Hahn* decision. But that's getting ahead of ourselves again. Suffice to say for the moment that the assessors lost.

e. Subdivision (e)

We next turn to Rule 152, subdivisions (e) and (f) (subdivision (e); subdivision (f)), because they address the problem of what to do when nontaxable *application* software *is* bundled.

 One should note at this point—that is, now that subdivision (d) has told us what bundling is—a practical problem for assessors in *valuing* computer hardware and software. What happens when *application* software that the Legislature has said in section 995 is *not* taxable *is* bundled into the "sale or lease price of the computer equipment"? As we have shown, subdivision (d) does not answer that question. It only tells you that *basic operational* (as distinct from *application*) software must be bundled into the price of the computer to be taxable.

And what happens in that scenario? Answer: The burden is on the taxpayer to do the work of segregating out the value of nontaxable application software from the otherwise taxable value of the computer.

Hence, one-sentence subdivision (e) begins by explicitly recognizing ·a dichotomy between what is taxable and what is not: "In valuing computer equipment that is sold or leased at a single price not segregated between *taxable property and nontaxable programs* as defined in section 995.2 of the Revenue and Taxation Code . . . ." (Italics added.)

And subdivision (e) ends by stating a de facto *presumption* rule that the assessor can just do the easy thing and value it all, *unless* the assessor has

"evidence to the contrary": ". . . the assessor, *lacking evidence to the contrary*, may regard the total amount charged as indicative of the value of taxable tangible property." (Italics added.)

### f. Subdivision (f)

There is a teaser in subdivision (e)—that reference to "evidence to the contrary." After reading subdivision (e), the reader is left to ask, what happens when the assessor *does* have "evidence to the contrary"?

As we have seen, neither subdivision (d) nor subdivision (e) answers that question. But one-sentence subdivision (f) does. It explains how a taxpayer would go about providing "evidence to the contrary," that is, rebutting the presumption that would otherwise allow the assessor to take the easy route: "(f) A person claiming that a single-price sale or lease includes charges for nontaxable programs and services should be required to identify the nontaxable property and services and supply sale prices, costs or other information that will enable the assessor to make an informed judgment concerning the proper value to be ascribed to taxable and nontaxable components of the contract." (*Ibid.*)

 The taxpayer is thus "required" to "identify" what is "nontaxable" so that the assessor can "make an informed judgment" as to the "taxable and nontaxable" components.

Now, one might wonder at this point: Is the board being a bit too harsh on taxpayers by effectively setting the "default setting" (to throw in some computerspeak) to "taxable value," with the *burden on the taxpayer* to provide information to the assessor in order to effectively turn the default setting off. After all, does not section 995.2 clearly say that application software is not taxable?

While this issue is not precisely before us here (because Cardinal Health is willing to provide the information to get the setting turned off), we will, not-so-gratuitously as we will show in a moment, opine that the answer is no. If you think about the practicalities, there is no other way to harmonize the nontaxability of application software under section 995.2 with the taxability of basic operational software under section 995. After all, it's the taxpayer who will necessarily be in a better position to carry a burden of showing what is not to be valued for taxation than a county tax assessor.

And here's why our comment is not too gratuitous: The burden on the taxpayer refutes the Assessor's posited model of Rule 152 in which the mere fact of bundling is dispositive.

To be sure, the Assessor's model certainly is an easy one to apply: Just look at the price of a computer that came with bundled software. The problem, it's contrary to what the Legislature said in section 995.2. The Assessor's model inserts a substantive term that the Legislature conspicuously omitted in section 995.2—the idea that application software must *not* be bundled if it is *not* to be taxed. As we have noted, though, section 995.2 doesn't engage in any such double negative. Section 995.2 says: "Excluded from the term 'basic operational program' are processing programs [then it elaborates on what processing programs are] and application programs [then it gives nonexhaustive examples of application programs]."

The State Board of Equalization evidently recognized what the Assessor here did not: Since the Legislature did not say, in section 995.2, that application software must be nonbundled in order to be nontaxable, the solution to the practical problem of valuation was to create a presumption (subd. (e)) and require the taxpayer to carry the burden of rebutting it (subd. (f)).

The Assessor argues that subdivision (f) is not applicable in cases where the customer does not have the option to accept or reject the software. There are two problems with the argument. One, not to be too repetitive, nothing in the *text* of subdivision (f) says that. That is, we would have to insert a limitation into the text that isn't there to agree with the Assessor. (Cf. Code Civ. Proc., § 1858 ["In the construction of a statute or instrument, the office of the Judge is . . . not to insert what has been omitted . . . ."].)

The most the Assessor can do is to say that allowing taxpayers to identify a portion of the cost is somehow anomalous (his phrase is that it "puts the proverbial cart before the horse") because the natural order of things is to first determine taxable status and then determine its value. Allowing the taxpayer to rebut a presumption is to start with the cost first. But—as we have noted—given the practicalities of bundled software, the idea of taxing bundled "basic operational" software *unless* the taxpayer can identify the value of nontaxable "application" software makes perfect sense.

The second problem for the Assessor's interpretation is that the natural sense of the text is positively inconsistent with his proffered limitation of subdivision (f) only to instances where the customer has the option to reject software.

Subdivision (f) opens with the image of a "person claiming that a single-price sale or lease includes charges for nontaxable programs and services." Stop there. If a person had the "option"—the Assessor's word, not the regulation's word—to accept or reject the software, the most natural state

of affairs is that the software would be separately priced. In fact, as we are about to see, it is Rule 152, subdivision (g) that addresses the Assessor's scenario of what one might call "itemized bundling," that is, where the computer comes with bundled software, with the various items of software separately priced.

Friend of the court, the Sacramento County Assessor, posits this interpretation of subdivision (f): That it is merely a procedural rule "designed to allow for the identification of computer programming that is not encompassed in subdivision (d)."

Again, there is no textual basis for such an assertion. (And the Sacramento County Assessor makes no attempt to ground his assertion in the text.) Subdivision (d) *defines* what it is to be bundled; subdivision (f), in order to accommodate section 995.2, tells you what can happen when it *is* bundled.

### g. Subdivision (g)

The next subdivision, subdivision (g) of Rule 152, continues exploration of the situation when hardware comes bundled with taxable and nontaxable software, except it addresses the relatively easier situation when the seller conveniently itemizes the various taxable and nontaxable bits. In that case, as one would expect, the actual price is "evidence" of the value of the nontaxable software, and, as evidence, may be used by the taxpayer to demonstrate what is taxable value and what is not: "(g) When the nontaxable components of a package composed of computer hardware, basic operational programs and nontaxable programs and services may be accepted or rejected at the option of the customer and the charge for each is itemized, such itemization constitutes evidence of the value of the component. Prices charged, whether at the wholesale or the retail level, for hardware only or hardware and basic operational programs also constitute evidence of the value of such property that may be used in segregating values when taxable and nontaxable properties or services are covered by a single-price contract." (*Ibid.*)

### h. Subdivision (h)

And, finally, the last subdivision in Rule 152 provides two examples of what is taxable, and what is nontaxable software. The first example, involving personal computers, implies (it doesn't quite say it directly, but that's the clear import) that the "basic input output system"—or "BIOS" in the acronym of the regulation—in every personal computer is taxable, since it is "fundamental and necessary" to the operation of that computer. But—and this is interesting (and the Assessor in this case never quite comes to grips with

it)—the subdivision implies (again, it doesn't quite say it out loud) that *even* an "operational" program that does not qualify as "BIOS" is not taxable, since a non-BIOS program is not "fundamental and necessary" to the operation of the computer: "(h) Example 1 (Personal Computers). [¶] Included in the price of every IBM and IBM compatible personal computer and every Apple and every Apple compatible personal computer is a basic input output system (BIOS). BIOS is a copyright computer program that controls basic hardware operations, such as interactions with diskette drives, hard disk drives and the keyboard, that the [*sic*] facilitates the transfer of data and control instructions between the computer and peripherals. The operation of other computer programs, such as the various versions of Disk Operating Systems (DOS), Windows, OS/2, UNIX and similar programs, is possible only through the facilities provided by BIOS, but operational programs other than BIOS are not in themselves fundamental and necessary to the functioning of the computer." (Rule 152, subd. (h).)

The second example, involving mainframe computers, is straightforward: The microcode that comes with every mainframe computer appears to be taxable since it is "fundamental and necessary," but—again, paralleling the first example—"operational programs" that do not qualify as "microcode" because they aren't fundamental and necessary, aren't taxable: "(2) Example 2 (Mainframe Computers). [¶] Included in the price of the IBM mainframe computers is a license to use IBM's Licensed Internal Code (LIC) on the computer. LIC is a set of copyrighted computer programs (commonly referred to in the computer industry as microcode) that include the programs that implement the basic functions of the mainframe computer and operate the control logic necessary to execute user instructions to the computer. Manufacturers of other computers likewise include in the price of their computers the microcode necessary to implement the basic functions of the computer. The operation of other computer programs is possible only through the facilities provided by microcode, but operational programs other than microcode are not in themselves fundamental and necessary to the functioning of the computer." (Rule 152, subd. (h).)

### 4. *The* Hahn *Case*

*Hahn, supra,* 73 Cal.App.4th 985, is the only published opinion to date addressing sections 995, 995.2, and Rule 152. In its minute order, the trial court indicated that it felt that the *Hahn* case was "strongly similar" to the present case, and in some unarticulated way, dispositive of it. For his part, the Assessor strongly relies on the case in his briefing. We will now examine it in detail.

By way of overview—as a glance at the counsel listings in the published opinion shows—*Hahn* was a struggle between a county tax assessor (helped

out by an army of amici curiae weighing in on behalf of other county tax assessors) and a state agency that had promulgated a tax regulation—subdivision (d) as it now reads, discussed above—which provided for the possibility that *basic operational* software that did *not* come with the computer, but had to be installed later, would *not* be taxed. The assessors didn't like the possibility, and thought it contravened the state Constitution (Cal. Const., art. XIII, § 1, subd. (a) ["Unless otherwise provided by this Constitution or the laws of the United States" all "property is taxable . . ."]) or was otherwise inconsistent with sections 995 and 995.2 (see *Hahn, supra,* 73 Cal.App.4th at pp. 996–997) because it created a "new property tax exemption" (*id.* at p. 990). The assessors sued the state board to establish that the regulation impermissibly allowed basic operational software sold separately from the computer hardware to escape taxation. (See *id.* at p. 992 [reference to assessors' contention that "statutory definition of 'basic operational programs' in section 995.2 *'unambiguously* permits the taxation of basic operational programs *without exception'* "]; *id.* at p. 997 [reference to assessors' argument that regulation created " 'a subclass of basic operational programs that are nontaxable: those that are not included in the sale or lease price of the computer equipment' "].) The challenge to the new rule was rejected, with the court holding that Rule 152 reflected the State Board of Equalization's properly interpreting the legislative intent in sections 995 and 995.2. (See 73 Cal.App.4th at pp. 998–999.)

The *Hahn* court outlined the history of property taxation of computer software in California, noting that "originally" businesses took the position that all software was "intangible personal property." (*Hahn, supra,* 73 Cal.App.4th at p. 992.) Indeed, in many jurisdictions, the tangible-intangible dichotomy is the paradigm.[9] California's dichotomy between basic operational and application software is a bit "different" than the norm.[10]

The *Hahn* court recounted the legislative history of what ultimately became, in 1972, section 995. The court noted that the original version of the bill, Assembly Bill No. 438 (1972 Reg. Sess.) (Assembly Bill 438) was based on the idea that *all* computer programs were seen as " 'expressions of creativity' " and *none* should be taxed, because it would be detrimental to research and business expansion. (*Hahn, supra,* 73 Cal.App.4th at p. 993.) Hence, the first version of Assembly Bill 438—what would become section 995—prevented property taxation of all software, including basic operational software that came bundled with the computer.

---

[9] See Note, *Property Taxation of Computer Software:* Northeast Datacom, Inc. v. City of Wallingford (1990) 23 Conn. L.Rev. 161, 168 (hereinafter, Software Note).

[10] See *In re Tax Protest of Strayer* (1986) 239 Kan. 136, 141 [716 P.2d 588]: "California has taken a different approach to the problem."

But that approach would have meant an *instant* revenue loss for county tax authorities, because hardware and software had been taxed together, as part of the " '*sales price of computer equipment*' " up to that point. (*Hahn, supra,* 73 Cal.App.4th at p. 994, fn. 8, quoting chief consultant to the Assem. Revenue and Taxation Com. in 1972, *Hahn* court's italics.) One must remember that it had only been in 1969—only a few years before 1972's Assembly Bill 438—that IBM began pricing software separately from hardware.[11] Exempting all software would have meant a huge drop in the taxable value of computers (then large mainframes) on the tax rolls.

So, the Governor "returned" the bill to the Legislature, where it was amended so that the *basic* computer programs that had been bundled into the "value of the computer hardware" would still have taxable value, "thereby preserving the existing tax base." (*Hahn, supra,* 73 Cal.App.4th at p. 993.) But—and the *Hahn* court took some pains to emphasize the distinction—taxation was limited to "basic operational" programs that had been " 'bundled' in the price of the computer," not other kinds of programs. (*Ibid.*) Significantly, the *Hahn* court quoted, and italicized, the legislative history which expressed the intent of the Legislature that " '*only those basic operational programs which are presently being assessed and taxed in the various counties continue to be assessed and taxed.*' " (*Ibid.*)

That amendment—essentially preserving the status quo as it stood in 1972—"resolved the revenue loss problem" and the Governor signed Assembly Bill 438 into law on June 23, 1972. (*Hahn, supra,* 73 Cal.App.4th at p. 994.) And that explains, with reference to our discussion of section 995 above, why the statute is chronologically pegged to "the 1972 lien date."

In the wake of newly enacted section 995, the *Hahn* court next recounted, in subheading "B." under "Discussion," how the State Board of Equalization adopted the original version of Rule 152, which (and one must read *Hahn* quoting the original Rule 152 carefully here) provided: "that 'basic operational programs' included those that were 'bundled' *and* those that were 'acquired separately,' and included 'processing' and 'service programs that assist in common repetitive operations of the computer.' " (*Hahn, supra,* 73 Cal.App.4th at p. 994.)

But then the *Hahn* court noted that the Legislature (specifically, the Assembly Revenue and Taxation Committee) *rejected* the approach in the original version of Rule 152, because it treated both "bundled and unbundled programs as 'basic operational programs.' " (*Hahn, supra,* 73 Cal.App.4th at

---

[11] Software Note, *supra,* at pages 161–162 ("In 1969, IBM shocked the computing world by announcing a revolutionary policy of pricing software as a separate component of its computer systems.").

p. 994.) *That* approach, declared *Hahn*, was "inconsistent" with the "intent" of Assembly Bill 438, which was that " 'basic operational programs' referred only to the programs presently being assessed and taxed in the various counties." (73 Cal.App.4th at p. 994.)

So, noted *Hahn*, the Legislature acted "swiftly" in 1973 to enact section 995.2 to define the key words "basic operational" to mean " 'fundamental and necessary to the functioning of a computer.' " (*Hahn, supra*, 73 Cal.App.4th at pp. 994–995.) As we have seen above, those words are still there.

The enactment of section 995.2 prompted the State Board of Equalization to react with the 1974 version of Rule 152, which limited " 'basic operational programs' *only*" to those that had been bundled. (*Hahn, supra*, 73 Cal.App.4th at p. 995, italics added.) The *Hahn* court then stated that at that point assessors "gave up their efforts to assess unbundled computer programs." (*Ibid.*)

Let's stop there for a second, because that last point reveals what the *Hahn* case was really about. It was about the attempts of assessors to tax *unbundled* programs. It was *not* about whether *bundling itself* is dispositive as to taxation. Thus, after noting a 20-year cease-fire in assessor efforts to collect taxes on *unbundled* programs, the *Hahn* court then brought the story line up to the present by relating recent events: In 1996 the State Board of Equalization amended Rule 152, including adding language to subdivision (d)—discussed above—requiring basic operational programs to have been "included in the sale or lease price of computer equipment." (See *Hahn, supra*, 73 Cal.App.4th at p. 996.)

As we have seen, subdivision (d) contemplates the possibility that nonbundled but basic operational software would not be taxed, and the assessors thought the State Board of Equalization had overstepped its authority. The assessors argued that the amended Rule 152 " 'creates a subclass of basic operational programs that are nontaxable: those that are *not included in the sale or lease price of the computer equipment.*' " (*Hahn, supra*, 73 Cal.App.4th at p. 997, italics added.)

It was in *that* context that the assessors made an argument from "functionality." In order to circumvent the burden of showing statutory invalidity as against the presumption of correctness enjoyed by the newly amended regulation (*Hahn*'s phrase was, "To avoid this ineluctable conclusion . . . ."), the assessors argued that the cease-fire concerning *non*bundled software had been predicated on functionality of the software program—basic operational versus processing. (*Hahn, supra*, 73 Cal.App.4th at p. 997.) That is, the

assessors were asserting a paradigm in which functionality was the test, *without reference to bundling*: If basic operational, taxable. If not basic operational, not taxable.

Which was a logical error, of course, as the *Hahn* court easily recognized. " '[F]unction,' " said the court, "was never the *sole* relevant factor to determine whether computer software was taxable." (*Hahn, supra,* 73 Cal.App.4th at p. 997, italics added.)

The court then explained why functionality was not dispositive. There were *two* foci from the beginning in 1972: (1) the idea that the only software that would be taxed was that which was taxed in 1972, and (2) the idea that only "bundled" programs would be taxed, "not separately acquired software." (*Hahn, supra,* 73 Cal.App.4th at p. 997.)

All that remained was for the court to address one argument. A number of cities as amici curiae had asserted that the widespread choice to buy software either " 'separately or installed in a computer' " had been "unanticipated" by the Legislature in the "early 1970's" so that, in effect, software not subject to a tax as the law stood then "ought" to be. (*Hahn, supra,* 73 Cal.App.4th at p. 998.) That was an argument for a legislative change that only the Legislature could address. (*Id.* at p. 999.)

In the case before us, the Assessor points out that "the *Hahn* court keeps going back to the issue of bundled versus unbundled software and whether the software program comes installed on the hardware or is purchased separately." (Respondent's brief.) The theory is that, under *Hahn,* bundling *by itself* is dispositive. Similarly, amicus curiae Sacramento County Assessor says that "The *Hahn* decision does *not* state anywhere in its opinion that software programming can be part of a 'bundled' programming package as defined in Rule 152(d) yet *not* be taxable under sections 995 and 995.2 as basic operational programming." (Amicus curiae brief.)

Both purported readings are misreadings because they ignore the context and the precise issue addressed by the court in *Hahn.* Both readings assume the issue in *Hahn* was whether *all* software that had been bundled was taxable. Back to our distinction between necessary and sufficient conditions— the assessors here think that *Hahn* made bundling a sufficient condition.

No. The issue in *Hahn* was whether *basic operational software* that had *not* been bundled was *required* to be taxed under sections 995 and 995.2, such that the board's regulation was in contravention of those sections. Simply put: The *Hahn* decision never had occasion to address the taxability of bundled *application* software.

Likewise, the focus on the rejection of "functionality" found in each assessor's brief is misplaced. The *Hahn* court did not reject "functionality" in a vacuum. It simply rejected functionality as a sole and sufficient reason to tax nonbundled basic operational software.

## IV. DISPOSITION

The judgment is reversed. The case is remanded for further proceedings on the issues of the valuation of the non-BIOS software in the MedStations that is not to be included in each station's taxable value. Appellant shall recover its costs on appeal.

Rylaarsdam, J., and Aronson, J., concurred.